**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

FILED

2024 DEC -   ...

KELLY BAXTER,
**Plaintiff,**
v.

Case #
1:24 CV 2204

**HUNTINGTON INGALLS INDUSTRIES, INC.,**
**Defendant.**

**COMPLAINT**
(Jury Trial Demanded)

**I. NATURE OF THE CASE**

1.  This is a civil action brought by Plaintiff Kelly Baxter against Defendant Huntington Ingalls Industries, Inc. ("HII") for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981, arising from events occurring after Plaintiff filed a charge of discrimination in January 2023 and subsequent right-to-sue letters.
2.  Plaintiff seeks damages for wrongful termination, retaliation, gender and racial discrimination, sexual harassment, violation of public policy, and emotional distress, all of which arose after the issuance of the EEOC Right to Sue letter in January 2023.

**II. JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343(a)(4) (civil rights), and supplemental jurisdiction over related claims arising under state law.

4. Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b) because the Defendant conducts business in this district, and the events giving rise to these claims occurred in this district.

**III. PARTIES**

5. Plaintiff Kelly Baxter is a resident of Bristow, Virginia, and was employed by HII from March 7, 2022 to February 5, 2024.

6. Defendant Huntington Ingalls Industries, Inc. ("HII") is a Delaware corporation with its principal place of business located at 4101 Washington Avenue, Newport News, Virginia 23607, and is an employer as defined under 42 U.S.C. § 2000e(b).

**IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7. Plaintiff previously filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding unlawful discrimination, sexual harassment, and retaliation under Case Number 1:24-cv-342-RDA-IDD.

8. The administrative process regarding Plaintiff's claims in this case, which stem from events occurring after December 2022, has been completed, and Plaintiff received the EEOC Right to

Sue letter for this claim on September 6, 2024. Plaintiff is filing this action within 90 days of receiving the Right to Sue notice, in accordance with Title VII. Plaintiff also received a dual-filed Notice of Right to File Civil Action on September 17, 2024.

## V. FACTUAL BACKGROUND: Summary

9. Plaintiff incorporates by reference all preceding paragraphs and claims from the prior case (1:24-cv-342-RDA-IDD).

10. On or about January 2023, following the issuance of the Right to Sue letter for earlier claims, Plaintiff began experiencing additional unlawful actions by Defendant, which form the basis of this lawsuit.

11. In May 2023, Plaintiff was selected for a promotion to Proposal Manager with a salary of $92,000, but the promotion was revoked after her prior manager left, and the Defendant placed Plaintiff's accused harasser as her reporting manager, worsening the hostile work environment.

12. Defendant falsely claimed budgetary constraints as the reason for Plaintiff's sudden dissolution of role as an Analyst, and revoking Plaintiff's promotion with assertion that a "more seasoned" manager was suddenly needed despite the three requisition openings at the time. Plaintiff was reassigned off the leadership team to a different role with reduced responsibilities and change in title.

13. In addition to the revocation of Plaintiff's promotion, Defendant denied Plaintiff career training opportunities, including a Shipley training, which was later revoked in retaliation for Plaintiff's complaints.

14. Plaintiff's job duties were further displaced, and she was placed on a Performance Improvement Plan (PIP) with unrealistic expectations, further exacerbating the hostile work environment and emotional distress.

15. On February 5, 2024, Plaintiff was wrongfully terminated after being subjected to retaliation, harassment, and discriminatory treatment by Defendant.

## FACTUAL BACKGROUND: Details

A. From January to March 2023, Ken Diller directed Plaintiff to assist the C5ISR Group and Division level Proposal teams on the company's highest-valued bid, "JNEEO," $1.5B. Contributions to this effort required a daily commute to the office, with extended time of 11-hour workdays on average, for which Plaintiff was never compensated. She received many accolades for her contributions, including appreciation from the Proposal Pricing Specialist, highlighting her critical process improvement contributions, timely responses, and fast turnaround on various requests.

B. During the "JNEEO" efforts, Ken Diller told Plaintiff, "I think you'd make an awesome Proposal Manager, you really have the temperament for it." This work effort involved daily unreported overtime hours, for which the Plaintiff was promised a $3,000 spot bonus if the JNEEO contract was won. Despite the contract being successfully secured, she never received the spot bonus and was not compensated for the overtime hours.

C. On March 3, 2023, Keemani Henry/HR reaches out to Ms. Baxter for an update impressing that Ms. Baxter never followed up with Ms. Henry; Ms. Baxter responded with a detailed update of hostile work environment, unwanted touching, disparate treatment, harassment and even Mr. Leonard being witnessed by another employee taking her

photo without her knowledge while in office. When Ms. Baxter saw Ms. Henry in the office about a week or more later Ms. Henry tells Ms. Baxter she had not yet "read through her lengthy email", causing Ms. Baxter to feel as though her reports were nothing more than a burden.

D. Also, on March 3,2023 Plaintiff received her first annual performance evaluation conducted by manager Ken Diller. Her overall evaluation ranked "Excellent Performer/4.3" with high remarks in several categories, including Business Growth, Support VP Growth & Strategy/Capture, Teamwork, Training/Personal Growth, and Employee Rating & Lives HII Values. Comments from Kenneth J. Diller praised her significant improvements in collaboration, communication, and standardization of processes, highlighting her key role in the success of the Growth Team, and acknowledging his confidence that she would grow far within the company.

E. After performing the duties of a Proposal Manager from January 2023 to March 2023, the Plaintiff was finally approved to pursue a Proposal Manager position. She received written approval to attend the necessary training for the role. This approval came despite other white employees being hired for the same position without prior experience or having completed the training before selection and onboarding..

F. On May 9, 2023, Scott Leonard conducted an internal interview with the Plaintiff for the Proposal Management position. In the opening of their meeting, Scott disparaged new hire Bettina Helena for not driving a vehicle and not wanting to go to lunch with him, Brad Nock, and Rich Gleason, and proceeded to tell Plaintiff that she "missed a free lunch."

G. On May 11, 2023, Ken Diller provided written approval for Shipley's Proposal Management training scheduling and one of the three open Proposal Manager positions. He asked Plaintiff to contact Division Proposal VP Traci Anderson regarding training procedures. After meeting Traci and support manager William Ball, Plaintiff informed Ken that they funded and scheduled all subordinate training with their corporate credit card. Ken Diller told Plaintiff to get a corporate card to schedule her training or pay for it out of pocket and fill out a form to be reimbursed.

H. On May 11, 2023, Scott Leonard emailed Plaintiff a corporate credit card application template. Plaintiff promptly completed it, as she needed to pay for her Shipley's Proposal Management training.

I. During this time, Plaintiff's co-workers, both existing and hired after her, received official career training, which included scheduled accommodations to attend training. Plaintiff submitted many company-approved training options to management but never received any accommodations or training submissions. Unlike her white co-workers who were provided the approved training, Ms. Baxter was directed to investigate how Other leaders provided their subordinates the training, and ended up having to apply for a corporate credit card to fund and secure the approved training.

J. Scott Leonard pressured Plaintiff to return her completed corporate credit card application form, containing personal information, directly to him. Uncomfortable with this, Plaintiff sent it to the appropriate contact instead. She then sought assurance from the proper contact that her application would not be shared with Scott Leonard and revoked his access to it.

K. On May 17, 2023, Scott Leonard provided Plaintiff with Rick Rossi's contact information, urging her to formally apply for the Proposal Manager position to fulfill internal paperwork requirements. He also introduced the possibility of a new role, the travel support position.

L. On May 18, 2023, Plaintiff met with Rick Rossi to confirm her interest in the Proposal Manager role. They discussed the internal transition process, with Scott informing them that Ken Diller would return the following week to finalize transition paperwork at which her official role start date would be determined. Rossi assured Plaintiff that her pay would match or exceed her current salary, initially suggesting $90k. When Plaintiff mentioned the minimum starting salary for the position was $92k, Rossi agreed to start her at that rate. He confirmed Ken Diller's support for the transition, mentioning Scott's advocacy for her. Rossi promised to follow up the following week upon Ken Diller's anticipated return to the office.

M. Ken Diller did not return from said leave and abruptly left HII the following week, before Plaintiff could secure Shipley's training, transition into the Proposal Manager position, or receive the promised spot bonus for "JNEEO" efforts.

N. On May 18, 2023, Plaintiff was ready to purchase Shipley's courses with her corporate credit card but was asked by Scott Leonard to postpone scheduling the training. He suggested a travel support role which he stated would be "much better suited" for her, but she declined, stating it didn't align with her career path as a Proposal Manager.

O. On May 22, 2023, Scott Leonard arranged a meeting with Plaintiff to discuss a potential travel support role. Mere minutes before the scheduled discussion, he forwarded her a PowerPoint presentation featuring an organizational chart with her name pre-filled, a detail that unsettled her due to the lack of prior consultation.

P. During the meeting, Scott attributed the creation of the role to Todd Gentry, citing budget constraints and the imperative to rectify the AAI contract. He asserted that the lateral move was not a demotion, a notion seemingly corroborated by conversations with HR. He emphasized the growth prospects associated with the new role, albeit underpinned by budgetary constraints and his own increased responsibilities which awarded him a raise in salary as well.

Q. HR permitted the Plaintiff's offender to become her reporting manager. Once in this position, he revoked her approved training, unselected her for the Proposal Manager position, and reassigned her from the leadership team to a lower-level, underperforming contract.

R. Plaintiff sought clarity on the potential for reverting to her previous Proposal Management path, receiving a somewhat ambivalent response indicating potential future openings. Scott, instead of providing detailed job duties and training plans, directed Plaintiff back to the attachment provided earlier.

S. Scott Leonard stated that due to changes in leadership and a lack of overhead budget (indicating that leadership could not afford to keep the Plaintiff while hiring a "lower-level admin below her station"), the Plaintiff's position was being dissolved. Scott Leonard explained that she would be "taking one for the team" by moving to the performance-failing contract, which was in danger of being lost due to backlog and

performance issues. He added that her lack of experience didn't matter because her role would focus on helping to recover good-standing with the client.

T.  The transition was tentatively scheduled for the following week, with Scott expressing concerns about redistributing Plaintiff's workload and the potential benefits of making her billable. While assuring Plaintiff that the move was in her best interests and aligned with business needs, Scott referenced a past instance involving another employee, "Jane Doe," who he said he felt similar affections for, stating he "loved her" and wished to continue working together though he could not justify the reason to leadership.

U.  Intriguingly, upon revisiting the recorded meeting months later, Plaintiff connected with "Jane Doe," who revealed shared discomfort with Scott, though she never reported it due to remote work arrangements. This disclosure hinted at broader concerns regarding Scott's conduct within the workplace, and the thoroughness of HR's investigation which was said to have concluded in extensive interviews yielding no findings.

V.  As a result, Plaintiff faced several setbacks: she was unselected for the Proposal Manager position that had been approved for her, her approved career training was revoked, and she was transferred to the underperforming C5ISR contract within Huntington Ingalls Industries, commonly known as "AAI," to join the travel support team. This move occurred under false pretenses that her position was dissolving due to the introduction of an executive assistant role to the Group President Todd Gentry. When Plaintiff voiced concerns about her lack of travel support experience, her reporting manager, Scott Leonard, reassured her that it wouldn't be an issue, emphasizing that her main task would be assisting the contract in resolving their backlog of over 100+ travel authorization requests, a task he believed aligned with her skill set.

W.  Per Huntington Ingalls Industries policy "TSO NO. H102," updated January 1, 2023, there is a process for transfers that includes a qualifying form labeled "IFC" check and interviewing by HR that was not given nor completed before transferring Plaintiff to the Travel department effective May 30, 2023.

X.  Immediately after the transition meeting with Scott Leonard, Plaintiff reported acting manager Scott Leonard's retaliatory hostile behavior to HR Lead Keemani Henry seeking clarification on Scott's claims of budget constraints and her position dissolution, which HR neglected to confirm. Plaintiff expressed deep disappointment over the revocation of her new Proposal Manager role and training, and how she had been networking with Traci Anderson, VP Proposal Management Lead for Division, to transfer to the Division proposal team upon promotion. She also expressed feeling that it was retaliatory for reporting sexual harassment incidents and a hostile work environment. Keemani Henry gave no response until June 13, 2023, after being prompted to respond. Around this timeframe, Plaintiff began experiencing what was diagnosed to be flares of stress-induced hives.

Y.  Plaintiff diligently documented each incident, including a recent email exchange with HR C5ISR Lead Keemani Henry regarding retaliatory behavior, mistakenly re-sent on June 12, 2023. This prompted a response from Keemani about 14 days after Plaintiff's abrupt transfer to the performance-failing AAI contract.

Z.  In this response from HR C5ISR Lead Keemani Henry, Keemani claimed that she knew nothing in detail about the transfer to "AAI."

AA.    Thereafter, the retaliatory hostile work environment did not improve. Instead, the work environment worsened.

BB.    In June 2023, Plaintiff began experiencing training sessions in the form of unwarranted coachings. Manager Bill McDonough started reviewing government/FEDSIM feedback on erroneous TAR deliverables as if errors were Plaintiff's fault, despite not training her on the errors causing kickbacks until after the fact. Plaintiff routinely implemented all training immediately upon reception.

CC.    Shortly upon the role transition, manager Charlotte Witzigman announced to the travel team that Plaintiff would be appointed the team TAR Lead. Despite only receiving training via processing walkthroughs, in her first month, Plaintiff produced 65-75 TARs, whereas the team as a whole had only submitted 14 in total for the previous month. Her production steadily increased, averaging over one hundred deliverables monthly, in addition to processing trip reports and learning FAR regulations. In August 2023, Plaintiff reached out to the EEOC.

DD.    On September 5, 2023, Plaintiff was contacted by recent hire Melody Walker, who onboarded in July 2023 and was inquiring about information and guidance on Plaintiff's old duties as a Business Development Analyst level 2 from a supposedly dissolved position that Scott Leonard said the team no longer had the budget for.

EE.    Plaintiff noted that new hire Melody Walker (White, female) was a Process Improvement Analyst 4 and that additional hires such as "low-level admin" Lisa Helt (White, female), an Admin Generalist 3, and "high-level" Capture Manager Adish Honishka were newly onboarded.

FF.    By October 2023, the AAI contract was officially removed from notice of losing the contract and was fully caught up on their backlog of deliverables, which enabled the contract to recover good standing with FEDSIM.

GG.    On October 26, 2023, when the AAI status of recovery was announced, Plaintiff was then transferred to the "DMATS" contract within the travel department, one month shy of the required six months working in a given position before one could transfer per Huntington Ingalls Industries policy "TSO NO. H102."

HH.    Plaintiff experienced escalated harassment and disparate treatment from travel team leaders and HR (write-ups for things other employees were not reprimanded for, negative marks for bereavement leave and PTO management offered her to take, negative marks on errors she was not trained on until after the fact, etc.). Plaintiff noticed disparaging treatment from her new managers Bill McDonough, C5ISR Operations Project Manager, and Pauline Tudor, DMATS Travel Support Lead, after helping "AAI" recover performance back to good standing status with the government client.

II.    HR negligence and harassment increasingly escalated (for instance Ms. Henry would suggest the Plaintiff was being paranoid or possibly making things up in her head when she reached out with additional incidents and inquiring guidance/updates on relief.

JJ.    Plaintiff reached out to Todd Gentry, requesting that she be transferred to another role within the organization as she felt that her mission was technically completed in recovering the AAI contract. Gentry responded that he would have someone reach out to her but never followed through.

KK.  Shortly after being assigned to the DMATS contract, the Plaintiff was unfairly placed on a Performance Improvement Plan. She responded in writing to all issues and concerns raised during multiple reviews but did not receive any feedback from management regarding her concerns.

LL.  On November 29, 2023, Plaintiff was scheduled for her first Performance Improvement Plan ("PIP") meeting for allegedly not meeting the standard of a Process Improvement Analyst 2 since beginning transfer to "AAI" (original written PIP document verbiage) claimed by Manager Bill McDonough, though he verbally stated "since transferring to the travel team," which he later revised to say "for the past two months" (after transferring to "DMATS"). The PIP included a 30-day period to improve performance or face immediate termination.

MM.  The PIP required a minimum of two daily check-in meetings (AM/PM) with Bill and Pauline, as well as ad hoc throughout the day; a daily activity submission detailing any and all items worked, along with other extraneous requirements, while also drastically reducing training and proper resources to successfully complete tasks. It emphasized that Plaintiffs improve communications immediately, all stated in the PIP within a target of a revised 60 days or face immediate termination.

NN.  On December 4, 2023, an HR meeting was held with C5ISR Lead Manager Keemani Henry and HR Business Partner Anna Braxton. During this meeting, the Plaintiff expressed that the adverse actions, PIP, and disparate treatment were related to her reports to HR (October 2022 - May 2023) of sexual harassment, hostile work environment, disparate treatment, and retaliation. In response, Keemani Henry blamed the Plaintiff for the lack of leadership action on her claims and asserted that the "untimely" PIP was unrelated to her previous reports of harassment.

OO.  When the Plaintiff complained about negligence and expressed that her displacement seemed to be HR and leadership's way of resolving her complaints without considering her desires, Keemani asked, "What response would you expect HR to do, and then I'll give you additional feedback." The Plaintiff reiterated her intent to transfer to the Division level proposal team upon role activation and sought help on how to keep training approval and proceed with the Proposal Manager role. Instead, she found herself unfairly displaced despite her transparency. The Plaintiff also mentioned that she had asked Scott Leonard for confirmation of her role's dissolution status but never received a response.

PP.  Keemani Henry responded with several negligent assertions:
- Claimed she initially did not mention the Plaintiff's complaints to anyone, asserting that the Plaintiff was clear in not wanting action taken and had asked her to hold off. Keemani said, "I feel like you think HR should have those answers and unfortunately the answers you sought had to come from your manager. It's not that I wanted to dissolve responsibility, but I didn't know. What I did find out after the fact was relevant to the team and not a need to know for you."
- Stated that the Plaintiff's team had a lot of movement, noting that Scott was being moved around and Ken Diller was no longer with the company. She suggested that sometimes concerns are "our imagination," and emphasized that the Plaintiff had spoken to others as well.

- Informed the Plaintiff that she could not reach Ken Diller, so she provided the Plaintiff's email to Todd Gentry, who confirmed that her position was being dissolved and he wanted to find another role for her. Keemani added, "Your managers must not have communicated that with you and I can't do anything about your managers not communicating with you."

QQ.    The Plaintiff felt that either HR knew and falsified facts about her investigation or they truly did not know, therefore failing to fulfill proper policy and internal protocols for her unjust displacement. This reckless negligence should have been addressed legally.

RR.    On December 4, 2023 In an HR meeting with Keemani Henry and Ana Braxton, Ms. Henry confirmed that group president Todd Gentry was provided with Plaintiff's emails of concerns asserting retaliation for reporting harassment. Ms. Henry quoted Todd Gentry as saying he was looking for another role to move Ms. Baxter too.

SS.    During the duration of the PIP, Plaintiff was continually harassed, antagonized, gaslighted, and scrutinized by Management and HR, giving heavy workloads and unrealistic time frames to complete with very limited to no official training, all despite Plaintiff's requests for official program training multiple times.

TT.    Per Huntington Ingalls Industries policy "TSO NO. H102," Plaintiff was prevented from being able to transfer to any other position due to alleged poor performance in her current position.

UU.    On December 5, 2023, Bill McDonough and Keemani Henry led Plaintiff's second PIP initiation meeting in which a revision was made to the existing PIP per Plaintiff's refutes, to include that there weren't any valid claims to support their accusation that Plaintiff had not met her labor category performance requirements being that "AAI" was able to recover their government contract to a status of "good standing".

VV.    On December 6, 2023, Bill McDonough sent an email to Plaintiff which entailed information on taking leave for bereavement but then shamed her in a written PIP evaluation stating that very few days were worked for the month. Included in these negative PIP remarks made by Bill were bereavement days, two standard holidays of December, and additional PTO Bill offered her to take only to later use against Ms. Baxter, for which she believes violates FMLA regulations.

WW.    On December 8, 2023, Plaintiff received an email from Bill McDonough, Pauline Tudar, and Keemani Henry, indicating that a report she was working on was taking excessively long to complete. Bill stated that he himself completed the same report in just 15 minutes.

XX.    On December 8, 2023, Plaintiff additionally faced a hostile incident from Manager Pauline Tudor, which she documented in her daily activity log.

YY.    On December 11, 2023, Plaintiff reached out to Pauline Tudor for her usual daily taskers. However, Pauline redirected Plaintiff to Bill, despite Bill not being involved in her daily taskers since her transfer to DMATS. This lack of communication continuity was contrary to the PIP requirements, which mandated daily check-ins with both Bill and Pauline. It's worth noting that Pauline's redirection of communication to Bill stemmed from a complaint Plaintiff mentioned in her daily log on December 8, 2023.

ZZ.    The Plaintiff observed that Pauline Tudor, a white female Administrative Generalist 3, was treated more favorably by management. Ms. Tudor was often permitted to neglect

leadership responsibilities in training, communication, and guidance, while her frequent emotional outbursts were overlooked by leadership. Additionally, Ms. Tudor was not required to communicate sudden schedule changes, in stark contrast to the Plaintiff who faced strict requirements and unlawful coaching even when adhering to company policy for schedule changes.

AAA.   Furthermore, The Plaintiff was expected to accommodate Ms. Tudor's last-minute schedule changes, often receiving advance notice of only a few hours, and sometimes with no heads up at all. Despite reporting these concerns, The Plaintiff found that management's unrealistic standards, which they themselves did not abide by, contributed to her negative performance evaluations and the increasingly hostile work environment.

BBB.   On December 12, 2023, Bill McDonough led Plaintiff's first PIP meeting, giving a list of taskers. Plaintiff was met with a lack of communication causing difficulty and unnecessary delay to an already strenuous and unrealistic time frame.

CCC.   On December 14, 2023, Plaintiff had an EEOC intake interview and filed a formal complaint on December 21, 2023.

DDD.   On December 19, 2023, HR representative Macatherine Maciano, also known as Cathy Mayo, contacted Plaintiff to notify her of a forthcoming investigation into her harassment complaints.

EEE.   On December 20, 2023, Plaintiff departed from work early due to illness, later confirmed by a doctor to be the flu. Although Bill McDonough permitted her to leave early, her absence from submitting a daily activity log for that day was later cited against her during a subsequent PIP meeting.

FFF.   On December 23, 2023, upon recovering from the flu, Plaintiff found a backlog of 6-7 urgent travel authorization requests (TARs) pending and unprocessed. Plaintiff's Manager, Pauline Tudor, had left for the day. Concerned about potential issues if the TARs remained unprocessed, Plaintiff reached out to Bill McDonough for guidance. When she received no response from Bill, she proceeded to process the TARs herself, as it fell within her assigned duties as the new TAR lead. However, she was later penalized via a PIP for "doing work not assigned to her," despite her efforts being appreciated.

GGG.   On January 8, 2024, Catherine Mayo and Marlene Howard met with the Plaintiff for an hour and five minutes. During the meeting, Catherine requested that the Plaintiff provide detailed information about her communication with Keemani Henry regarding Senior Proposal Leader Scott Leonard. Catherine also asked for written documentation of everything discussed to aid in the investigation. Catherine Mayo further asserted that the Plaintiff must provide all incidents in writing, causing further turmoil as she had to start over with a new HR contact. Several HR members, including Keemani Henry, Ana Braxton, and others, joined in the harassment and contributed to the hostile work environment. These members participated in meetings where the Plaintiff's evidence supporting her claims was denied review and her case circumstances were refused discussion.

HHH.   On January 10, 2024, during a PIP meeting, Bill assigned new tasks to Plaintiff. Despite lacking previous training, she received only a brief explanation, lasting

approximately 10 minutes, on how to complete these new assignments. Concurrently, Plaintiff was still recovering from the flu and felt pressured by HR to meet deadlines, which was communicated to Bill, adding to her sense of overwhelm.

III.   On January 25, 2024, facing a demanding workload, Plaintiff detailed her concerns to Bill in her daily log activity report. She noted the disparity between positive meeting feedback and subsequent PIP reviews lacking tangible improvement standards. She questioned if discussions about task issues would be used against her in future reviews. She also highlighted perceived inconsistencies in communication and coaching from Bill and Pauline. Despite Bill's meeting running late until 5:09 pm, Plaintiff was flexible with the timing but felt it unnecessary as her direct manager, Pauline, was available to address her questions regarding DMATS. Plaintiff expressed frustration at being steered away from communicating with Pauline in Bill's absence. Additionally, she referenced feeling penalized for personal circumstances such as holidays, bereavement leave, and illness, while others on the team were not held to the same standard.

JJJ.   Along the duration of the PIP, Defendant members Bill McDonough, Pauline Tudor, and Kristen Marley hold various daily meetings with Plaintiff to discuss performance progress during which Plaintiff was often commended for contributions (i.e. process improvement ideas assisting in streamlining processes, encouragement she was asking the right questions, etc) however Ms. Baxter observed in official PIP review meetings she continued to receive unjust claims that her performance was still lacking. Plaintiff asked for clarified targets of specific improvement goals however tangible targets remained elusive and therefore unattainable. (for instance, target given by Bill McDonough "to improve communication", which he defined as direct calling him after an incident occurrence where Ms. Baxter reached out with questioning only to be ignored until the next day. Ms. Baxter satisfied this target through attending 2-10 meetings daily with management in addition to emailing, MS Teams chatting, all in addition to direct calling for questions that could delay deliverable processing arose, and although Bill commended her in daily meetings for these improvements still she was told her "communications did not improve" in PIP review.

KKK.   On February 2, 2024 (Friday), HR representatives Marlene Howard and Cathy Mayo conducted a meeting to inform the Plaintiff of the results of their internal investigation. They stated, "At this time we cannot substantiate the sexual harassment claim; however, we are taking appropriate action regarding the photography in the workplace." When the Plaintiff inquired about the process of the investigation and the actions that would be taken to assist her, Marlene Howard responded with frustration and hostility, stating that the only purpose of the meeting was to inform the Plaintiff of their conclusion that they could not substantiate the sexual harassment claims and that no further details would be provided. Marlene then abruptly brought up the Plaintiff's Performance Improvement Plan (PIP) review meetings, selectively quoting comments the Plaintiff made to manager Bill McDonough when expressing concerns about disparate treatment. Despite being fully aware of the Plaintiff's additional concerns regarding disparate treatment, Marlene refused to discuss or investigate these issues. Marlene stated, "We are finished with the sexual harassment piece. What we owed you was a sexual harassment response. We've done that, we're comfortable with our investigation, and that's as far as we're

going to take this." The Plaintiff expressed concerns about the thoroughness of the investigation, mentioning "Jane Doe" who had disclosed similar unreported concerns, indicating that the investigation lacked depth. The Plaintiff also emphasized the seriousness of her complaints, the fact that the complaint was successfully accepted by the EEOC, and her willingness to schedule another meeting to discuss unresolved disparate treatment complaints in an effort to resolve them internally. Despite this, HR reiterated that their investigation was based solely on her initial complaint and that they had spoken with all the relevant employees who were still around. When Marlene asked if the Plaintiff had any other concerns and the Plaintiff confirmed that she had many unresolved concerns regarding disparate treatment, she was dismissed without further discussion. This clearly demonstrates HR's refusal to address or investigate the Plaintiff's additional concerns of disparate treatment, showcasing a pattern of negligence and retaliation.

LLL.    On February 5, 2024 (Monday), HR reps Keemani Henry, Ana Braxton, and Manager Bill McDonough informed Plaintiff that effective immediately they had decided to terminate her employment based on the reasoning that her performance never consistently improved nor met the standard of a Process Improvement Analyst 2.

MMM. During her tenure with HII, Plaintiff experienced various health concerns as an adverse result of these experiences, including but not limited to severe anxiety and depression, panic attacks, stress-induced flares of hives that would range in severity and location of her body (worse cases occurring in November and December 2023 where hives covered her arms, neck, chest, abdomen, breasts, back, and even legs), nosebleeds, insomnia, heavy bleeding and migraines upon trialing various prescribed medications for some of these conditions, extreme mood swings impacting her family life, elevated blood pressure, PTSD, and even weight gain in excess of 30 pounds (for which she spent roughly $5k on a fitness program tailored to her needs just before her role displacement which ended up wasted due to her schedule change and new work demands).

NNN.   During her tenure as a Business Development Analyst Level 2 at Huntington Ingalls Industries, Plaintiff excelled at her role and received recognition for her performance. Despite an abrupt transfer and a lack of training, she continued to excel in her new role as a Process Improvement Analyst.

OOO.   In conclusion, Huntington Ingalls Industries has fostered a culture of discrimination and a hostile work environment against Plaintiff and other women on the basis of gender. They have retaliated against Plaintiff, including creating and permitting a retaliatory hostile work environment, for making complaints concerning discrimination, harassment, and retaliation, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Virginia Human Rights Act, Virginia Code § 2.2-3900, et seq.

## VI. LEGAL CLAIMS

## COUNT I – Retaliation in Violation of Title VII

16. Plaintiff incorporates by reference all preceding paragraphs.

17. Plaintiff's protected activities, including filing prior discrimination charges and opposing unlawful practices, were a substantial factor in Defendant's retaliatory actions against Plaintiff, including the revocation of her promotion, denial of career training, and wrongful termination.

18. Defendant's conduct constitutes retaliation in violation of Title VII.

## COUNT II – Gender and Racial Discrimination in Violation of Title VII

19. Plaintiff incorporates by reference all preceding paragraphs.

20. Defendant's actions of revoking Plaintiff's promotion, reassigning her to a lower-level role, and placing her on an unwarranted PIP were discriminatory based on her gender and race, in violation of Title VII.

21. Plaintiff was subjected to disparate treatment compared to similarly situated male and non-minority employees, which violated Title VII's prohibition on gender and racial discrimination.

## COUNT III – Wrongful Termination in Violation of Public Policy

22. Plaintiff incorporates by reference all preceding paragraphs.

23. Defendant's termination of Plaintiff's employment violated Virginia public policy, which prohibits retaliation against employees for engaging in protected activities such as reporting discrimination and harassment.

**VII. DAMAGES**

24. As a result of Defendant's unlawful conduct, Plaintiff has suffered:

a. Back pay, front pay, and lost benefits, including loss of career development opportunities;

b. Emotional distress, mental anguish, and humiliation;

c. Medical damages resulting from stress-induced conditions, including migraines and hives;

d. Punitive damages under 42 U.S.C. § 1981a(b) to deter Defendant and others from engaging in similar conduct;

e. Attorney fees and costs as provided under 42 U.S.C. § 2000e-5(k).

**VIII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. Compensatory damages in an amount to be determined at trial, including back pay, front pay, and benefits;

2. Punitive damages to deter Defendant from engaging in discriminatory and retaliatory conduct;

3. Emotional distress damages;

4. Pre- and post-judgment interest;

5. Attorney fees, costs of this action, and any other relief deemed just and equitable by the Court.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

12/5/2024

Respectfully submitted,
Kelly Baxter
9105 Rustic Way, Bristow, VA 20136
804-822-7159
kelly.g.baxter@gmail.com
Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Complaint has been served on the Defendant via certified mail at its registered office address:
Huntington Ingalls Industries, Inc.
4101 Washington Avenue
Newport News, Virginia 23607

Dated: December 5, 2024

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
_Alexandria_____DIVISION

_Kelly Baxter_
_____
       **Plaintiff(s),**

         v.                                     Civil Action Number: ___1:24 cv 2204___

_HII, Mission Technologies_                              (TBD)
_____
       **Defendant(s),**


## LOCAL RULE 83.1 (N) CERTIFICATION


I declare under penalty of perjury that:

No attorney has prepared or assisted in the preparation of __Complaint_____.
                                                                                         (Title of Document)

_Kelly Baxter_
_____
Name of Pro Se Party (Print or Type)

_____
Signature of Pro Se Party

Executed on: __12/5/2024___(Date)

                              **OR**

The following attorney(s) prepared or assisted me in preparation of _____.
                                                                                              (Title of Document)


_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

_____
(Name of Pro Se Party (Print or Type)

_____
Signature of Pro Se Party

Executed on: _____(Date)